UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ARDIS THOMPSON and GLORIA THOMPSON,**<br><br>        Plaintiffs,<br><br>  v.<br><br><br>**ORKIN, LLC,**<br><br>        Defendant. | **1:20-CV-13085-TGB-PTM**<br><br>HON. TERRENCE G. BERG<br><br>**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 51)** |

In this toxic tort case, Plaintiffs Ardis Thompson and Gloria Thompson allege that Defendant Orkin, LLC negligently over-applied a pesticide to their home on two occasions, causing the Thompsons to suffer physical and emotional injuries as well as economic damages.

Now before the Court is Defendant's Motion for Summary Judgment, ECF No. 51, seeking summary judgment on the Thompsons' claims. The motion is fully briefed, and the Court will consider the motion without oral argument pursuant to E.D. Mich. LR 7(f)(2).

After careful consideration of the parties' briefing, the Court will **GRANT IN PART** and **DENY IN PART** Defendant's Motion for Summary Judgment for the reasons stated below.

1

## I.   BAKGROUND

### A. Factual Background

In May 2018, Plaintiffs Gloria and Ardis Thompson contacted Defendant Orkin, LLC to treat their home for insects because Mrs. Thompson was experiencing "itching" which she attributed to bug bites. G. Thompson Dep. 55–56, 80–81, ECF No. 44-8, PageID.632, 638. On May 31, 2018, Orkin technician Paul Hutchinson treated the Thompsons' bedroom for fleas using PT Alpine Flea and Bug Pressurized Insecticide ("PT Alpine"), manufactured by BASF. ECF No. 44-6, PageID.577.

PT Alpine is a "non-restricted use" pesticide, meaning it is registered with the Environmental Protection Agency ("EPA"), the EPA has reviewed and approved it for general use by consumers, and that no special license or training is necessary to use it. Christopher Weis Dep. 25, ECF No. 44-4, PageID.504. The PT Alpine label states that it "Kills fleas for up to 30 days. Kills hatching flea eggs for up to 7 months…. FOR USE IN: Apartments, Commercial Structures, Homes, Hotels, Kennels, Motels, and Veterinary Clinics." ECF No. 44-2, PageID.454. The label provides that it should be applied "at the rate of 20 ounces [one can] for up to 2,625 square feet (10 ounces [half can] for up to 1,300 square feet), applying in a sweeping motion at a speed of 1 foot per second. **DO NOT** apply more than 20 ounces per 2,625 square feet." *Id.* PageID.456. The directions further state that users must "[v]acate areas to be treated and **DO NOT** reoccupy or contact treated surfaces until dry." *Id.*

2

The "Precautionary Statements" section of the PT Alpine label, the subsection labelled "Hazards to Humans and Domestic Animals," provides:

> **CAUTION. Contains Petroleum Distillate.** Avoid contact with skin or clothing. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, using tobacco, or using the toilet.

*Id.* PageID.455. The "First Aid" section of the label further provides that if PT Alpine comes in contact with the skin to (1) "[t]ake off contaminated clothing" (2) "[r]inse skin immediately with plenty of water for 15 to 20 minutes" and (3) "[c]all a poison control center or doctor for treatment or advice." *Id.*

At the Thompsons' regular pest control visit on June 28, 2018, Mrs. Thompson informed Orkin employee Mike Baker that she was still experiencing what she believed to be insect bites. G. Thompson Dep. 55–56, 80–81, ECF No. 44-8, PageID.632, 638. In response, Baker applied a second PT Alpine flea treatment to the Thompsons' house on July 18, 2018. *Id.* 113, PageID.646; ECF No. 44-9, PageID.696. The service ticket for that second application states that the Orkin technician "treated all the carpeted rooms and tiled kitchen and bathrooms" and lists the following locations: bathroom, bedroom, kitchen, living room. ECF No. 44-9, PageID.696. Baker instructed the Thompsons to leave the house for at least four hours following the treatment, G. Thompson Dep. 80–81, ECF No. 44-8, PageID.638, and the Thompsons testified that they did not

3

return to their home for over eight hours. *Id.* 78; A. Thompson Dep. 67–68, ECF No. 44-12, PageID.784.

Upon returning to the house that evening, the Thompsons state that the carpeting on the floor in the house was still damp to the touch. G. Thompson Dep. 75, ECF No. 44-8, PageID.637; A. Thompson Dep. 28, ECF No. 44-12, PageID.774. Mrs. Thompson testified that she walked on the carpet barefoot and afterwards felt a "burning" sensation that "starts from the inside out," extending "[a]ll over [her] body." G. Thompson Dep. 47, 58, 70–71, ECF No. 44-8, PageID.630, 633, 636. That evening, Mrs. Thompson bathed with water because of the burning sensation, and Mr. Thompson took a shower. *Id.* 117, PageID.647. Mr. Thompson testified that a couple of days after their home was treated with PT Alpine for the second time, he "started feeling this burning in my feet" which led to "numbness" and "tingling" in his feet. A. Thompson Dep. 28–29, ECF No. 44-12, PageID.774.

Approximately three weeks later, on August 9, 2018, Mrs. Thompson went to the Covenant Hospital Emergency Department reporting a "burning sensation to her entire body." ECF No. 44-11, PageID.730. The emergency room records document that Mrs. Thompson has a history of anxiety and rheumatoid arthritis and that upon examination she had no rash or skin color change. *Id.* PageID.731–32. The doctor noted that Mrs. Thompson complained that she had been exposed to PT Alpine several weeks ago when her home was treated for

4

fleas, and he noted that he "highly doubt[ed] that an exposure several weeks ago would be causing [Mrs. Thompson's] symptoms." *Id.* The doctor further noted that he "did speak with poison Control" and that "[t]hey believe this exposure is less likely to be causing the patient's symptoms." *Id.* PageID.730–32. The doctor however advised Mrs. Thompson "to have her carpets washed as continued exposure may be causing her symptoms" and diagnosed Mrs. Thompson with "[d]iffuse pain" and "[d]ermal chemical exposure." *Id.* PageID.732.

Mr. Thompson claims that while he felt "numbness," "tingling," and "burning" in his feet a couple of days after the July 18, 2018 PT Alpine treatment, he did not seek medical treatment for these symptoms at that time. A. Thompson Dep. 28–29, 32–33, ECF No. 44-12, PageID.774–75. Mr. Thompson testified that he did, however, talk to his regular doctor about "the situation that was happening" approximately six months later, in January 2019 during his Medicare annual wellness visit. *Id.* 131–132, PageID.800. At that visit, Mr. Thompson testified that he reported "[a] little itching" on his face and a burning feeling in his feet. *Id.* 134–135, PageID.801.

On November 29, 2018, the Thompsons filed a complaint with the Michigan Department of Agriculture and Rural Development ("MDARD") against Orkin concerning the two PT Alpine applications in their home. MDARD Inspection Report, ECF No. 44-13, PageID.820. MDARD investigated the Thompsons' complaint and on December 3,

2018, collected five swab samples (with one of those swabs being a "blank" sample, meaning it did not "swab" a surface in the Thompsons' home and was used to test for any contamination or ambient sources of the chemicals tested for), 1 clothing sample, and 1 carpet sample at the Thompsons' home and tested these samples for the presence of the three active ingredients in PT Alpine: dinotefuran, pyriproxyfen, and prallethrin. *Id.* at PageID.826. Each of the non-blank test samples contained trace amounts of dinotefuran and pyriproxyfen, and only one test sample contained trace amounts of prallethrin. *Id.* PageID.820, 826.

MDARD concluded that "[s]ample results show that trace amounts of the active ingredients in PT Alpine [ ] in the [Thompsons'] home while application records indicate the product was slightly over applied during the May 31st, 2018 application to the [Thompsons'] home." *Id.* PageID.820. MDARD found the following violations:

1. MCL 324.8311(9) & R 285.637.4(a): Orkin, LLC failed to apply PT Alpine Flea & Bed Bug Pressurized Insecticide, (EPA Reg. No. 499-540), in a manner that is consistent with the pesticide label during the May 31st, 2018, application to the Thompson's home by applying over the allowed label limit per square foot.

2. MCL 324.8313(1): Orkin, LLC applied PT Alpine Flea & Bed Bug Pressurized Insecticide, (EPA Reg. No. 499-540), to the Thompson's home on July 1[8]th, 2018, with commercial applicator license that was suspended by MDARD on June 28th, 2018.

3. R 285.636.12(1): Orkin, LLC failed to notify MDARD of the change of the firm's qualified applicator named on the Saginaw branch license application when Mr. Sager moved from the Saginaw branch to the Pontiac office and no notarized statement of experience was submitted for the Saginaw branch's new qualified applicator.

4. R 285.636.15(2)(c)(g): Orkin, LLC failed to include amount of pesticide end use dilution applied and rate of application on the firm's May 31st, 2018, application record following the application of PT Alpine Flea & Bed Bug Pressurized Insecticide, (EPA Reg. No. 499-540), to the Thompson's home.

*Id.*; Notice of Violation, ECF No. 51-3, PageID.1688–89. MDARD fined Orkin $1,000.00, which Orkin paid on March 28, 2019. W. Klinger Decl. ¶¶ 7–8, ECF No. 51-3, PageID.1686.

The Thompsons moved out of their house shortly thereafter and into their church for a period of two years. A. Thompson 75–78, ECF No. 44-12, PageID.786–87. They did not return to their house until after ServPro performed remediation services, cleaning the surfaces and removing carpeting, and new flooring was installed. *Id.*

## B. Procedural Background

On or about June 29, 2020, the Thompsons sued Defendant Orkin in the Saginaw County Circuit Court. Compl., ECF No. 1-2, PageID.16–22. Orkin removed this case to this Court on November 19, 2020. ECF No. 1.[1]

---

[1] On September 1, 2023, this case was reassigned from retired District Judge Victoria A. Roberts to the undersigned.

The Thompsons claim that Orkin negligently applied PT Alpine at their home on May 31, 2018 and July 18, 2018. Compl., ECF No. 1-2, PageID.18–20. The Thompsons also complain of "statutory and ordinance violations" by Orkin for alleged violations of certain Michigan statutes and regulations related to the application of PT Alpine. *Id.* PageID.20–22. The Thompsons allege that Orkin's negligence caused their physical injuries, including loss of appetite, "rash, burning sensation, skin irritation, severe dermatitis, [and] tingling in toes," as well as mental anguish/distress and loss of consortium. ECF No. 47-2, PageID.1561. The Thompsons seek monetary damages for their pain, suffering, mental anguish, and loss of consortium, and economic damages for cleaning and floor replacement, as well as reimbursement for clothing and other property they discarded in the belief that those items were contaminated. *Id.* Specifically, the Thompsons claim an estimated $45,000 in replacement costs for "personal property in the form of clothing, shoes, curtains, and furniture" they were "required to dispose of," and $19,252.75 for remediation work to their home provided by ServPro, including removing floor coverings. ECF No. 51-2, PageID.1650–51, 1670–76; *see also* A. Thompson Dep. 76–77, 116–119 ECF No. 44-12, PageID.786, 796–97. The Thompsons also assert they paid $6,399.00 for new flooring. ECF No. 51-2, PageID.1650, 1682–83.

On January 2, 2025, the Court entered an Order granting in part and denying in part Defendant's motion to exclude Plaintiffs' expert

witnesses and denying Plaintiff's motion to exclude Defendant's expert witnesses. ECF No. 60. Specifically, Plaintiffs' epidemiological expert Dr. David Goldsmith's general causation opinion that PT Alpine is capable of causing the Thompsons' claimed depression was excluded but his general causation opinion that PT Alpine was capable of causing the Thompsons' claimed dermal ailments was admitted. Plaintiffs' expert toxicologist Dr. Christopher Weis's opinion that the timing and progression of Thompsons' health effects are consistent with excessive exposure to the PT Alpine pesticide mixtures that were applied in their home and are a likely cause of those health effects was admitted. And Plaintiffs' psychiatric expert Dr. Gerald Shiener's diagnoses of the Thompsons of posttraumatic stress disorder with secondary depression, based on his March 15, 2021 virtual examination of them, was admitted but his opinion that those diagnoses were caused by the Thompsons' exposure to PT Alpine was excluded.

Defendant's expert Dr. Jeffrey Parker's opinion based on his November 12, 2022 independent medical evaluation of the Thompsons was admitted. Defendant's risk assessment expert Ryan Weidling's opinion regarding the potential risks to the Thompsons from exposure to PT Alpine was admitted. Defendant's toxicology expert Elaine Freeman's opinion regarding the potential human health effects resulting from exposure to the components contained in PT Alpine was admitted. And finally, Defendant's epidemiology expert Dr. Shamarial Roberson's

opinion that there is no epidemiological evidence to determine that the health outcomes reported by the Thompsons were caused by exposure to PT Alpine was admitted.

Defendant Orkin has filed a Motion for Summary Judgment, seeking dismissal of the Thompsons' claims. ECF No. 51. Orkin argues that it is entitled to judgment on the Thompsons' negligence claim in Count II because they cannot establish causation or injury to themselves or their property. Orkin further argues that the Thompsons' claim for violation of certain Michigan statutes and regulations in Count III fails because those statutes and regulations do not provide a private right of action.

The Thompsons have filed a Response in opposition to Orkin's motion. ECF No. 54. The Thompsons argue that they have presented sufficient evidence, including expert evidence, from which a reasonable jury could conclude that Orkin's over spraying of PT Alpine in their home on two occasions caused their injuries, and that they have presented sufficient evidence of physical, emotional, and non-economic injuries. The Thompsons further contend that they have stated an actionable negligence claim against Orkin for Orkin's violation of applicable statutes and regulations related to its application of PT Alpine to their home.

Orkin filed a reply brief in support of its motion for summary judgment. ECF No. 55. Orkin contends that the Thompsons misrepresent

the evidence regarding Orkin's application of PT Alpine to their home and argues again that the Thompsons have failed to proffer specific or general causation evidence necessary to sustain their negligence claim.

## II.   LEGAL STANDARD

A party is entitled to summary judgment it if "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). No genuine material factual dispute exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the Court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. *Id.* The nonmoving party's evidence need not be in an admissible form. *Celotex v. Catrett*, 477 U.S. 317, 332 (1986). But he must "show that [he] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

## III.   DISCUSSION

As subject matter jurisdiction of this case is based upon diversity of citizenship between the parties, the Court applies the substantive law of the State of Michigan to the Thompsons' negligence claims. *Erie Railroad*

*v. Tompkins*, 304 U.S. 64 (1938). In Michigan, a prima facie case of negligence requires proof that (1) the defendant owed a legal duty to the plaintiff, (2) the defendant breached that duty, (3) the breach was the cause of the accident, and (4) the plaintiff suffered damages. *See, e.g, Hills v. Sears, Roebuck & Co.*, 822 N.W.2d 190, 195 (Mich. 2012). Orkin disputes the last two elements of the Thompsons' negligence claim in Count II of their Complaint—causation and damages.

### A. Count II – Causation

Orkin argues that the Thompsons cannot, as a matter of law, establish that Orkin's actions in applying the pesticide PT Alpine to the Thompsons's home on two occasions were the cause of the Thompsons' claimed injuries. In a general negligence action, a plaintiff must show both but-for cause ("cause-in-fact") and proximate cause ("legal causation"). *O'Neal v. St. John Hosp. & Med. Ctr.*, 791 N.W.2d 853, 858 (Mich. 2010) (citing *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994)). "The cause in fact element generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Skinner*, 516 N.W.2d at 479; *see also Weymers v. Khera*, 563 N.W.2d 647, 648 (Mich. 1997) (the plaintiff must present "substantial evidence" from which a jury could conclude that, more likely than not, "but for the defendant's conduct, the plaintiff's injuries would not have occurred"). "[L]egal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant

should be held legally responsible for such consequences." *Skinner*, 516 N.W.2d at 479.

In a toxic tort case like this under Michigan law, the plaintiff must generally also present, as part of the cause-in-fact element, admissible general-causation and specific causation evidence through proof that the toxic substance was capable of causing and did cause the plaintiff's alleged injury. *Powell-Murphy v. Revitalizing Auto Communities Env't Response*, 964 N.W.2d 50, 57 (Mich. App. 2020); *see also In re Flint Water Cases*, 579 F. Supp. 3d 971, 985 (E.D. Mich. 2022) (Levy, J.); *but see Lowery v. Enbridge Energy Ltd. P'ship*, 898 N.W.2d 906, 913 (Mich. 2017) (Markman, C.J., concurring) (explaining that in some instances the general and specific causation framework may be unnecessary, "such as when the resulting injury is immediate and traumatic rather than gradual and disease-based" like "a plaintiff who suffers a chemical burn immediately after toxic acid has been spilled onto his skin."). "General causation 'pertains to whether a toxin is capable of causing the harm alleged[,]' … [and] [s]pecific causation, in turn, requires 'proof that exposure to the toxin more likely than not caused *the plaintiff's* injury.'" *In re Flint Water Cases*, 579 F. Supp. 3d at 985 (emphasis in original) (quoting *Powell-Murphy*). The Michigan Supreme Court has explained that the general and specific causation "concepts 'are not "elements" of a plaintiff's cause of action' but rather 'function as devices to *organize* a court's analysis …. So long as the plaintiff introduces admissible and

13

sufficient evidence of factual causation, the burden of production is satisfied.'" *Lowery*, 898 N.W.2d at 913 n.10 (quoting Restatement, § 28, comment c, p. 405 (emphasis added)).

The Michigan Supreme Court in *Skinner* summarized a plaintiff's burden regarding proving cause-in-fact causation:

> All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty. Absolute certainty cannot be achieved in proving negligence circumstantially; but such proof may satisfy where the chain of circumstances leads to a conclusion which is more probable than any other hypothesis reflected by the evidence.

*Skinner*, 516 N.W.2d at 481 (quoting 57A AM. JUR. 2d, Negligence, § 461, p. 442). A plaintiff therefore may rely on circumstantial proofs to establish the causal link between the defendant's conduct and the plaintiff's injury. *See Powell-Murphy*, 964 N.W.2d at 57; *Genna v. Jackson*, 781 N.W.2d 124, 128 (Mich. App. 2009) ("Cause in fact may be established by circumstantial evidence"). "To survive summary judgment Plaintiffs need only show sufficient evidence to 'facilitate reasonable *inferences* of causation." *In re Flint Water Cases,*579 F. Supp. 3d at 987 (citing *Genna*, 781 N.W.2d at 128). "[T]he Court must consider whether there is enough evidence to permit a reasonable jury to find in favor of Plaintiff—not whether Plaintiffs have brought an open-and-shut claim." *Id.* at 988.

14

Therefore, to prove causation in this case, the Thompsons must show (1) that PT Alpine is "capable of causing the harm alleged" (general causation) and (2) that "exposure to [PT Alpine] more likely than not caused [the Thompsons'] injury" (specific causation). *In re Flint Water Cases*, 579 F. Supp. 3d at 985. Both causation inquiries involve scientific assessments that generally must be established through the testimony of an expert. *See Lowery*, 898 N.W.2d at 917–18 ("[T]he generally applicable rule in Michigan is that expert testimony is required when highly technical and scientific questions are at issue.") (citations omitted); *but see Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 434 (6th Cir. 2009) ("We conclude that when a plaintiff claims that a defendant was negligent in filling a hotel room with a cloud of a poisonous substance, and there is evidentiary support for such claims, expert testimony is not required to show negligence, and the district court erred in holding otherwise."); *Genna*, 781 N.W.2d at 129 (declining to find that "direct expert testimony is required to establish the causal link, not inferences").

Orkin contends that it is outside the common knowledge and experience of an ordinary layperson to determine if the Thompsons' exposure to an "overspray" of PT Alpine was capable of causing, and did cause, their reported symptoms, and thus expert testimony is necessary to establish causation in this case. While Orkin argues in its motion for summary judgment that the Thompsons' retained experts must be excluded, the Court previously addressed Orkin's motion to exclude those

experts and granted it in part and denied it in part. ECF No. 60. The Court concluded that the Thompsons' epidemiologist, Dr. David Goldsmith, was precluded from offering a general causation opinion that PT Alpine was capable of causing the Thompsons' claimed depression, but that he could opine that PT Alpine, and particularly the petroleum distillates that make up seven to ten percent of PT Alpine, were capable of causing the Thompsons' claimed dermal ailments. *Id.* The Court concluded that the Thompsons' toxicologist, Dr. Christopher Weiss, could opine that the timing and progression of the Thompsons' health effects are consistent with excessive exposure to the PT Alpine pesticide mixtures that were applied in their home and are a likely cause of those health effects in the Thompsons. And, the Court admitted the Thompsons' psychiatry expert Dr. Gerald Shiener's diagnoses of the Thompsons with posttraumatic stress disorder with secondary depression based on his virtual examinations of the Thompsons, but excluded Dr. Shiener's opinion that those diagnoses were caused by the Thompsons' exposure to PT Alpine. ECF No. 60. Accordingly, the Thompsons are not lacking expert testimony in support of their claim that Orkin negligently over sprayed their home with PT Alpine, causing their claimed injuries, including expert testimony regarding general and specific causation.

As discussed above, "Plaintiffs may survive summary judgment if a reasonable jury could find that it is more likely than not that Defendant[]

caused Plaintiffs to be exposed to a sufficient quantity of a hazardous substances capable of causing their injuries." *Gass*, 558 F.3d at 431 (citing *Liberty Mut. Ins. Co. v. Bay City Water Dep't.*, 116 N.W.2d 199 (Mich. 1962)). The Court finds that the evidence here, when viewed in the light most favorable to the Thompsons and drawing all reasonable inferences in their favor, can meet that causation standard with respect to the Thompsons' claimed physical, dermal ailments. While Orkin argues that the presence of PT Alpine in the Thompsons' home, and the alleged temporal relationship between their exposure and their claimed symptoms alone are insufficient to prove causation, that is not all the evidence the Thompsons present. The Thompsons testified that when they returned home on July 18, 2018, eight hours after Orkin applied PT Alpine to their home for the second time, the carpet was still damp, despite the fact that the Orkin pesticide applicators testified the PT Alpine application should dry in "[a]bout 15 minutes," Hutchinson Dep. 61, ECF No. 44-7, PageID.596, or "[m]aybe 30 minutes to an hour." Baker Dep. 101, ECF No. 44-10, PageID.723. The Thompsons testified that soon after walking on the damp carpet they experienced symptoms including a burning sensation, numbness, tingling, an itch burning, and eventually burns and "scaly" and "rough patches" on Mrs. Thompson's skin. G. Thompson Dep. 63–64, 66–68, 70–73, ECF No. 44-8, PageID.634–36; A. Thompson Dep. 28–29, ECF No. 44-12, PageID.774. Mr. Thompson later called Orkin to tell them that "the floor is burning our feet." A. Thompson

Dep. 34, ECF No. 44-12, PageID.776. This direct testimony of injury is evidence the jury could consider in support of the Thompsons' negligence claim. *See Swartz v. The Procter & Gamble Mfg. Co.*, No. 16-cv-12396, 2018 WL 2239558, at *3 (E.D. Mich. May 16, 2018) (Leitman, J.) (concluding that where a burn appeared on plaintiff's skin roughly two hours after being exposed to concentrated detergent, "a jury could reasonably conclude, without speculating, that the concentrated detergent from the POD caused the burn on [plaintiff's] breast"); *see also Sunnycalb v. CSX Transp., Inc.*, 926 F. Supp. 2d 988, 995 (S.D. Ohio 2013) ("While CSX correctly points out that the mere fact that two events correspond in time and space does not necessarily mean they are causally related, 'a temporal relationship between exposure to a substance and the onset of a disease … can provide compelling evidence of causation.'") (quoting *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1059 (9th Cir. 2003)).

Orkin relies on the Michigan Supreme Court's decision in *Lowery* to support its position, but that case is distinguishable. In *Lowery*, the plaintiff alleged that fumes from an oil spill in a river near his property caused him to suffer certain negative health effects. *Lowery*, 898 N.W.2d at 906. In support of his claim, the plaintiff had shown only that (1) before the oil spill he was not suffering from certain negative health effects and (2) after the spill, he was suffering from the complained-of negative health effects. *Id.* The plaintiff argued *only* that because his health issues

18

arose after the oil spill, they must have been caused by the spill. *Lowery*, 898 N.W.2d at 906. The Michigan Supreme Court found that theory of causation rested upon "the logical fallacy of *post hoc* reasoning" and amounted to "mere speculation" and "conjecture" that was insufficient to establish causation. *Id.* at 907; *see id.* at 920 (noting that the plaintiff "did not show that he was exposed to any "VOCs [volatile organic compounds as a result of the oil spill 11 to 13 miles upstream from the plaintiff's home], let alone exposure of the magnitude necessary to cause his particular symptoms").

Here, the Thompsons offer more than "*post hoc* reasoning." In addition to their testimony of feeling carpet that was still damp immediately after being treated with PT Alpine and experiencing nearly contemporaneous burning symptoms, followed later by other symptoms including numbness, tingling, and itching, the Thompsons also offer their experts' opinions that PT Alpine could cause their symptoms and that it is a likely cause of those symptoms. Specifically, as discussed above, Dr. Goldsmith testified that PT Alpine could cause the dermal ailments the Thompsons experienced, and Dr. Weis similarly concluded that PT Alpine could cause, and likely did cause, the Thompsons' symptoms.

Orkin argues that the Thompsons cannot rely on the PT Alpine Material Safety Data Sheet ("MSDS") to establish causation because it is designed only to warn about potential effects of a product and it cannot show that an individual was exposed to enough of the product to cause a

potential effect or how much exposure was required. There are 12 separate categories of information that must be included in the MSDS, including the identity of the chemical components, health hazards posed, toxicological information, first aid measures, and exposure controls and personal protection. 29 C.F.R. § 1910.1200(g)(2). The MSDS for PT Alpine therefore lists the chemical makeup of the pesticide, including the percentage of each of its chemical components. *See* ECF No. 45-15. The Court finds that the Thompsons and their experts properly point to the MSDS for PT Alpine and the MSDSs of its components as evidence that PT Alpine could cause and did cause the Thompsons' injuries. *See Gass*, 558 F.3d at 431–43 ("While the record contains little evidence regarding the toxic effects of Suspend SC, based on the MSDS for Demand CS, a reasonable jury could conclude that Demand CS is capable of producing many of the symptoms experienced by Plaintiffs[.]"); *see also Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir. 2009) (admitting expert's testimony based on his conclusions "from the MSDS sheet and his own knowledge of medicine and chemistry that the chemicals it contains can cause damage to the nasal and sinus mucosa upon inhalation"); *Sunnycalb*, 926 F. Supp. 2d at 995 (finding MSDS sheet's warnings that exposure to the product's chemicals could cause certain injuries, along with the timing of the plaintiff's chemical exposure and onset of symptoms, sufficient to establish causation).

Further, while Orkin faults the Thompsons' experts for relying on the MSDSs for PT Alpine's individual components to satisfy causation, ECF No. 55, PageID.1751–53, the Court finds the experts' reliance on the MSDSs for PT Alpine's individual components properly justified in this case. The MSDS for PT Alpine, when addressing its toxicity, states "The product has not been tested. The statement [regarding toxicity] has been derived from the *properties of the individual components*." *See* ECF No. 45-15 (emphasis added). The Thompsons' experts' reliance on the MSDSs for the individual components of PT Alpine is therefore justified and appropriate.

In addition, Mrs. Thompson went to the emergency room a few weeks after first experiencing symptoms, complaining of a "burning sensation to her entire body" that "began several weeks ago after her home was treated for fleas." ECF No. 44-11, PageID.730. She reported that the "sensation began as a burning to her feet" and then "worked its way up her legs and now includes her entire body." *Id.* While the records show that the doctor treating Mrs. Thompson "highly doubt[ed] that an exposure several weeks ago would be causing [Mrs. Thompsons'] symptoms," he nevertheless diagnosed her with "[d]iffuse pain" and "[d]ermal chemical exposure" and advised her to "have her carpets washed as contaminated exposure may be causing her symptoms." *Id.* at PageID.730–32.

21

The Thompsons further point out that the MDARD investigation confirmed the presence of PT Alpine's active ingredients in the Thompsons' home, carpet, and clothing five months after the July 18th application of PT Alpine. ECF No. 44-13, PageID.820. The Thompsons contend that this report shows that in their home they were exposed daily to PT Alpine for several months. *See* Weis Dep. 72, ECF No. 44, PageID.516 ("there was definitely exposure. I mean, that's clear" from the MDARD Report). As explained *infra*, the statutory and regulatory violations found by MDARD can serve as evidence of negligence in support of the Thompsons' claim. *See Johnson v. Bobbie's Party Store*, 473 N.W.2d 796, 801 (Mich. App. 1991).

This evidence, viewed in the light most favorable to the Thompsons, satisfies the causation prong of their negligence claim. Orkin is not entitled to summary judgment on this claim as it relates to the Thompsons' physical injuries. However, without expert testimony or any other evidence that PT Alpine could cause the Thompsons' claimed depression, or that it did cause their depression, the Court finds that summary judgment is appropriate on that aspect of the Thompsons' negligence claim.

Finally, the Thompsons seek economic damages for the cost of cleaning and replacing flooring and clothing and furniture they claim they discarded as "contaminated." Orkin argues that there is insufficient evidence to prove those economic damages were caused by Orkin's alleged

negligence in over spraying PT Alpine. Orkin contends that the Thompsons only subjectively believed these items were damaged by Orkin's PT Alpine applications based on MDARD's testing showing trace amounts of PT Alpine's active ingredients in the Thompsons' home, but that there is no record evidence that any of the property was actually damaged. Orkin states that in response to its request to "[d]escribe[] the method by which you determined that personal property had to be sold, discarded, destroyed, donated, disposed of, or otherwise removed by any means," the Thompsons responded:

> Every sample taken by MDARD tested positive for the active ingredients in the product, including the sample from the 'clothing taken from closet in master bedroom,' even though several months had passed since Orkin sprayed the home; and MDARD concluded that Orkin had over-sprayed. Therefore, the Thompsons began to discard the contaminated items.

ECF No. 47-2, PageID.1560. Orkin argues that without expert opinion testimony as to whether Orkin's PT Alpine application damaged the Thompsons' personal property, Orkin is entitled to summary judgment on the Thompsons' claim for property damage.

The Thompsons respond that they may recover expenses they incurred as part of their effort to mitigate their damages. They assert that "it was reasonable for the Thompsons to remediate their home and discard the carpet, and other contaminated items," and that "a plaintiff's testimony regarding valuation [of their personal property] is sufficient in Michigan." ECF No. 54, PageID.1740–41 (citing *Thompson v. Freeman*,

No. 273197, 2008 WL 4092853, at *1 (Mich. Ct. App. 2008) ("Contrary to defendant's argument, plaintiff Thompson was competent to provide testimony regarding property value" for lost furniture, toys, and clothes.)). *See also Willis v. Ed Hudson Towing, Inc.*, 311 N.W.2d 776, 778 (Mich. App. 1981) ("Public policy demands that, when damages are not susceptible of precise calculation because of an act of the wrongdoer, the risk of giving more than fair compensation be cast upon the wrongdoer.").

In *Genna v. Jackson*, 781 N.W.2d 124 (Mich. App. 2009), the plaintiff was permitted to testify that he lost of the contents of his condominium valued at almost $75,000 because of mold contamination, without any expert evidence as to the value of that property or whether it was contaminated by mold. *Id.* at 132 (concluding that the plaintiff "would have been aware of the value of those items, because they were his belongings and he knew how much he paid for them."). The court stated that "[j]urors are expected to apply their 'common experience' in assessing facts," and "[u]sing their common experience, the jurors likely concluded that [plaintiff's] testimony about the value of the contents of his home was accurate given the corroborating evidence, the commonplace items plaintiffs were replacing (soap, pillows, sheets, furniture, groceries, etc.), and the lack of any evidence contrary to his testimony." *Id.* (internal quotation marks and citation omitted). The court explained that "[w]hen the claimed negligence involves 'a matter of

common knowledge and observation,' no expert testimony is required." *Id.* (internal quotation marks and end citation omitted) (holding that the trial court properly allowed the testimony of the plaintiff about the value of the contents of his home).

Here, the MDARD report showed that five months after the second PT Alpine treatment there were still trace amounts of PT Alpine's active ingredients on the Thompsons' home, carpet, and clothing. That same investigation determined that Orkin failed to apply PT Alpine to their home in a manner consistent with the pesticide label. ECF No. 44-13. ServPro also provided remediation services at the Thompsons' home, including washing all surfaces and tearing out non-salvageable carpet. ECF No. 51-2. The Court finds that this evidence, considered in the light most favorable to the Thompsons, is sufficient to create a genuine issue of material fact as to whether Orkin's alleged negligence caused them to incur these damages. Accordingly, Orkin is not entitled to summary judgment on the Thompsons' claim for economic damages caused by Orkin's alleged negligence.

### Count II – Injury/Damages

Orkin next argues that the Thompsons cannot prove physical injury to their persons or property, and that without such proof their negligence claim fails. Orkin states that the Michigan law requires "a present physical injury in the toxic tort context" and that this physical injury must be "*in addition* to economic losses that result from that injury in

25

order to recover under a negligence theory." *Henry Dow Chem. Co,* , 701 N.W.2d 684, 688, 690 (Mich. 2005) ("It is the *present* injury, not fear of an injury in the future, that gives rise to a cause of action under negligence theory.") (emphasis in original).[2] Orkin further contends that in Michigan "common law recognizes emotional distress as the basis for a negligence action only when a plaintiff can also establish *physical* manifestations of that distress." *Id.* at 692. Orkin contends that the Thompsons have not proffered evidence of a present physical or property injury and therefore their negligence claim fails.

The Thompsons claims that they have suffered physical injuries as a result of the alleged over spraying of PT Alpine in their home. As discussed above, both Mr. and Mrs. Thompson testified that they immediately experienced symptoms of burning, numbness, itching, and tingling after walking across the damp carpet on July 18, 2018. G. Thompson Dep. 58–60, ECF No. 44-8, PageID.633 (describing the burning as "like someone putting a fire, a match or something to your body."); A. Thompson Dep. 2829, ECF No. 44-12, PageID.774 (stating his feet and toes got numb after walking on the carpet). Mrs. Thompson testified to having burns and raw spots on her skin, mostly on her "private part" and her thigh and her breasts and that her body has "rough

---

[2] The plaintiffs in *Henry* sought damages only for the costs of medical monitoring following a dioxin discharge from a chemical plant, for fear of a future injury, and not for a present physical injury or the enhanced risk of present physical injury. *Henry*, 701 N.W.2d at 689 & n.4.

places there that you feel where I have been burned." G. Thompson Dep.
63–64, 67, ECF No. 44-8, PageID.634–35. She testified that she continues
to experience these same problems today and that "it has not changed."
*Id.* 67–68, PageID.635. Mr. Thompson testified that he has seen these
rough spots on his wife's skin, which he described as "very scaly like
rough" and that he "tr[ies] to treat it with Vaseline." A. Thompson Dep.
188, ECF No. 44-12, PageID.814. He also confirmed seeing raw spots on
his wife's skin following the over spraying of PT Alpine. *Id.* And Mr.
Thompson complained that his skin around his "toe area" began to "peel
a little bit." *Id.* 42–43, PageID.778. Mrs. Thompson also testified to
experiencing mental and emotional distress as a result of Orkin's alleged
negligence. G. Thompson Dep. 59–61, 87–88, ECF No. 44-8, PageID.633
("I'm having a nervous breakdown from it.").

A "[p]laintiff may typically testify regarding her symptoms but not
regarding the underlying medical diagnosis." *Good v. BioLife Plasma
Servs., L.P.*, 605 F. Supp. 3d 947, 964–65 (E.D. Mich. 2022) (Ludington,
J.). Accordingly, the Thompsons here "may testify regarding the nature,
timing, and extent" of their symptoms "as these issues are clearly within
[their] perception[s]" *Id.* In addition, Mrs. Thompson sought medical
treatment about three weeks after the alleged over spraying of PT Alpine
with complaints of a burning sensation to her entire body, and while the
doctor "highly doubt[ed] that an exposure several weeks ago would be
causing [Mrs. Thompson's] symptoms," he did recommend that Mrs.

Thompsons "have her carpets washed as continued exposure may be causing her symptoms" and diagnosed her with "[d]iffuse pain" and "[d]ermal chemical exposure." ECF No. 44-1, PageID.730–32. And the Thompsons can present expert testimony that PT Alpine could, and likely did, cause the Thompsons' complained of symptoms. *See* ECF No. 60, PageID.1819–20 (concluding that Dr. Weis may opine "that the Thompsons' claimed symptoms, which they testify occurred immediately after returning from the July 18, 2018 PT Alpine application, were caused by their exposure to PT Alpine."). In addition, Dr. Shiener diagnosed the Thompsons with posttraumatic stress disorder with secondary depression, although he cannot offer expert testimony that those diagnoses were caused by the Thompsons' exposure to PT Alpine. ECF No. 60, PageID.1825.

Viewed in the light most favorable to the Thompsons, this proof would allow a reasonable jury to infer that the Thompsons suffered a physical injury because of Orkin's alleged negligence in applying PT Alpine to their home.

Again, Orkin argues that the Thompsons have failed to offer any admissible evidence that their home or personal property suffered a cognizable injury. Orkin contends that the Thompsons only have their subjective belief that the trace amounts of PT Alpine's active ingredients detected by MDARD caused property damage and permanently injured them, but that they have no objective evidence supporting that opinion.

In support of its argument, Orkin relies on the unpublished opinion from the Michigan Court of Appeals, *Trice v. Oakland Dev. Ltd. P'Ship*, No. 278392, 2008 WL 7488023 (Mich. Ct. App. Dec. 16, 2008), in which the plaintiff alleged that the defendants negligently allowed water to intrude into her apartment, which caused mold that damaged her property and caused her personal injury. *Id.* at \*18. The plaintiff sought to recover damages for "contamination to her personal property and expenses incurred in trying to remediate" the property. *Id.* The trial court granted summary judgment to the defendants, stating:

> Plaintiff's evidence regarding mold contamination on the walls and on three items of property is not sufficient to support a finding that the remainder of the property in the residence (none of which showed signs of visible mold or was tested for the presence of mold) was contaminated. Moreover, even if such items had mold on them, Plaintiff's evidence is insufficient to establish that the extent of the contamination required that the property be remediated and/or destroyed. Therefore, summary disposition of this claim is appropriate pursuant to MCR 2.116(C)(10).

*Id.* The court however did not further discuss what "personal property" was at issue or the plaintiff's "evidence regarding mold contamination" offered for review by the court. The appellate court found that the plaintiff had abandoned this issue because she "fail[ed] to make a legal argument or cite any legal authority" in response to the defendant's argument on appeal. *Id.*

"[T]he long held common-law rule in Michigan is that the measure of damages for the negligent destruction of property is the cost of replacement or repair." *Price v. High Pointe Oil Co.*, 828 N.W.2d 660, 665 (Mich. 2013). In support of their claim that they suffered property damage, the Thompsons assert that they began discarding items upon learning of the MDARD test results that all samples—including carpet and clothing—taken from their home five months after the last PT Alpine treatment revealed trace amounts of the active ingredients for PT Alpine. Pls' Supp. Discovery Responses, ECF No. 47-2, PageID.1558–59. The Thompsons state that ServPro inspected their home "for remediation purposes" on or about August 20, 2019, and that their carpet was replaced at a cost of $6399.00. *Id.* PageID.1558–61. The Thompsons have produced the ServPro remediation estimate and the receipt for the carpet replacement. ECF No. 51-2, PageID.1670–76, 1682–83. It does not appear, however, that they have offered any record evidence as to the value of their clothing or other personal property for which they seek recovery.

The Court finds, viewing the evidence in the light most favorable to the Thompsons and drawing all inferences in their favor, that their claim of personal property damage is supported by sufficient evidence to proceed to trial. *See Genna*, 781 N.W.2d at 131-32 (holding that the trial court properly allowed the testimony of the plaintiff about the value of the contents of his home). However, while "[t]here is no fixed rule for

30

measuring compensation for damages to personal property … proof of the amount of damages may not be founded on speculation or conjecture." *Hering v. Wildwood Condo. Ass'n*, No. 187514, 1997 WL 33350524, at *1 (Mich. Ct. App. Apr. 25, 1997) (citing *Strzelicki v. Blaser's Lakeside Ind's of Rice Lake, Inc.*, 348 N.W.2d 311, 313–14 (Mich. App. 1984)); *see also Trost v. Trost*, 525 F. App'x 335, 342–43 (6th Cir. 2013) ("This is particularly true if the inexactness is due to the [defendant's] conduct, in which case '[p]ublic policy demands that … the risk of giving more than fair compensation be cast upon the wrongdoer.'") (citation omitted); *Gibbons v. Miller*, No. 236988, 2003 WL 1455565, at *3 (Mich. Ct. App. Mar. 13, 2003) ("Where articles do not have a standard or market value, their value to the owner, so far as they are susceptible of pecuniary measurement which is not fanciful or merely speculative, furnishes the true test.") (citing *Bernhardt v. Ingham Reg'l Med. Ctr.,* 641 N.W.2d 868, 871 (2002)). Thus, the Thompsons may only recover for those personal property damages that they support with proper evidence at trial.

## B. Count III – Statutory Violations

The Thompsons alleged in Count III of their Complaint that Orkin violated Michigan statutes and regulations when it treated their home with PT Alpine on May 31, and July 18, 2018. ECF No. 1, PageID.20–21. Specifically, the Thompsons allege that Orkin violated Michigan's Natural Resources and Environmental Protection Act ("NREPA"), MCL § 324.8010, *et seq.*, including MCL §§ 324.8303(5) and 324.8313(1), and

failed to include the amount of pesticide and use dilution applied and rate of application on its May 31, 2018 application in violation of pesticide regulation R258.636.15(2)(c)(g). The Thompsons assert that these violations create a presumption and inference of negligence and entitle them to money damages. *Id.* The Thompsons attach to their Complaint the MDARD's Notice of Violation of these sections as to Orkin. ECF No. 1-2, PageID.33–34.

Orkin argues that it is entitled to summary judgment on Count III of the Thompsons' Complaint because the statutes and regulations cited do not provide a private right of action. With this the Court agrees.

In Michigan generally, "a plaintiff cannot make a viable claim for money damages based strictly on violation of a statute unless the Legislature provides for a private statutory cause of action." *Randall v. Michigan High Sch. Athletic Ass'n*, 965 N.W.2d 690, 701 (Mich. App. 2020) (citing *Lash v. Traverse City*, 735 N.W.2d 628, 638–39 (Mich. 2007)). The statute must either provide an express private statutory cause of action, or the court may infer a cause of action if the statute provides no adequate means of enforcement of its provisions. *See id.* at 701–02 ("Courts have held that where the Legislature has provided other means for enforcing a statute's provisions, inferring a private statutory cause of action for money damages is not warranted.") (citing *Lash,* 735 N.W.2d at 638–39).

32

Here, the Michigan NREPA expressly provides for administrative and criminal penalties and fines for violations of the relevant parts of the statute, but it does not provide for a civil cause of action. *See* MCL § 324.8333. Indeed, under that statute, Orkin was assessed a fine of $1000, which it paid on March 28, 2019. ECF No. 51-3, PageID.1686. Therefore, because the statutory and regulatory provisions the Thompsons cite in their Complaint do not expressly create a private right of action, and because those sections create an "adequate means of enforcement" through administrative action, which MDARD utilized in this case, the statute and regulations cited by the Thompsons do not create a private statutory cause of action independent of the Thompsons' negligence claim in Count II of their Complaint. *See Randall*, 965 N.W.2d at 702.

However, "[t]his question is distinct from the separate question of whether violation of a statute factors into a common-law negligence cause of action[.]" *Randall*, 965 N.W.2d at 701. "The Legislature can create a duty by statute, but not every statute creates such a duty." *Id.* at 703. "To determine whether a statute creates a particular duty with respect to a particular party, courts generally consider two questions: (1) did the Legislature intend that the statute would prevent the type of injury and harm actually suffered by the party; and (2) did the Legislature intend that the party was within the class of persons protected by the statute?" *Id.*

The Thompsons assert that Count III of their Complaint is a "restatement" of their negligence claim, and that the statutes and regulations confirm that Orkin had a legal duty to the Thompsons with regard to the application of PT Alpine in their home, and that the record evidence shows that Orkin breached that duty. Specifically, the Thompsons assert that this statute and the regulations confirm that Orkin had a legal duty to the Thompsons to properly apply PT Alpine to their home. MDARD determined that Orkin violated MCL § 324.8311(9) and R 285.637.4(a) on May 31, 2018 by "fail[ing] to apply the pesticide consistent with the label by applying the product in the customer's home over the allowed label limit per square foot." ECF No. 1-2, PageID.33. MCL § 324.8311(9) provides "Each person shall follow recommended and accepted good practices in the use of pesticides, including, but not limited to, use of a pesticide in a manner consistent with its labeling." Orkin does not dispute in its motion for summary judgment that it owed a legal duty to the Thompsons with respect the application of PT Alpine to their home, so that issue is not before the Court.

In any event, "[t]he existence of a legal duty is not, however, the end of the analysis" because "Michigan law does not 'subscribe to the doctrine of negligence per se.'" *Randall*, 965 N.W.2d at 703 (quoting *Candelaria v. BC Gen. Contractors, Inc.*, 600 N.W.2d 348, 356–57 & n.5 (Mich. App. 1999)); *see also Johnson v. Bobbie's Party Store*, 473 N.W.2d 796, 801 (Mich. App. 1991) ("[I]t is well established that whereas a

violation of a statute creates a rebuttable presumption of negligence, a violation of an ordinance or administrative rules and regulations is only evidence of negligence.") (citations omitted). Thus, while a violation of the statute may serve as prima facie evidence of negligence, the Thompsons still must demonstrate that "the violation had a causal connection to the claimed injury." *Randall*, 965 N.W.2d at 703 (citing, in part, 57A Am. Jur. 2d § 738 p. 711 ("A jury is free to find that a violation of a statutory duty is not necessarily the direct cause of the injury.")).

Accordingly, while there is no independent private right of action for the alleged statutory and regulatory violations in Count III, such alleged violations may be considered by the jury as evidence of in support of the Thompsons' negligence claim in Count II of their complaint.

## IV.   CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment (ECF No. 51).

Specifically, the Court **GRANTS** summary judgment to Orkin on the Thompsons' claim that Orkin's negligence caused their depression, and **GRANTS** summary judgment in favor of Orkin on Count III of the Thompsons' Complaint because it fails to state an independent statutory negligence claim against Orkin.

The Court otherwise **DENIES** Orkin's motion for summary judgment as to the Thompsons' negligence claim against Orkin.

This Order does not close the case.

**IT IS SO ORDERED.**

Dated: February 24, 2025     /s/Terrence G. Berg
                            HON. TERRENCE G. BERG
                            UNITED STATES DISTRICT JUDGE